{¶ 1} Plaintiff-Appellant, the State of Ohio appeals the judgment of the Bellefontaine Municipal Court granting Defendant-Appellee's, Benny E. Phillips', motion to suppress all evidence relating to charges brought against him after a traffic stop. Finding that Phillips' crossing of the right white edge line did not provide either probable cause or a reasonable articulable suspicion to commence a traffic stop and that there was not competent credible evidence to support a violation of R.C. 4513.05(A), we affirm the judgment of the trial court.
 {¶ 2} In April of 2004, Phillips was charged with failure to obey a traffic control device in violation of R.C. 4511.12 and operating a vehicle under the influence of alcohol in violation of R.C.4511.19(A)(1). Phillips pled not guilty to both charges.
 {¶ 3} In May of 2004, Phillips filed a motion to suppress any evidence relating to the violations of R.C. 4511.12 and R.C. 4511.19, asserting that the state trooper did not have a reasonable suspicion to believe that he was operating his vehicle while under the influence of alcohol and that there was no probable cause to stop or arrest him for operating a vehicle under the influence of alcohol or for failure to obey a traffic control device.
 {¶ 4} In June of 2004, Phillips filed an additional motion to suppress any evidence relating to the violations of R.C. 4511.12 and R.C.4511.19, asserting that the field sobriety tests were not conducted in strict compliance with the standardized testing procedures of the National Highway Traffic Safety Administration.[1]
 {¶ 5} On June 18, 2004, the trial court held a hearing on the two suppression motions. At the hearing, the following testimony was presented.
 {¶ 6} In April of 2004, at approximately 2:00 a.m., Ohio State Highway Patrol Trooper Timothy Ehrenborg was engaged in routine traffic patrol in Logan County, Ohio. While Trooper Ehrenborg was traveling northbound on State Route 235, he observed Phillips' southbound vehicle travel "across the right [white] edge line out of the marked lanes * * *." (Suppression Hearing Tr. p. 5) Trooper Ehrenborg described the section of roadway where he observed Phillips' southbound vehicle as follows:
 Q: [C]an you describe the roadway for us [where the incident occurred]?
 A: It is asphalt. There's a marked center line and marked edge line on both sides.
 Q: Is it curvy, flat, straight?
 A: It's flat and straight after the curve. Where the violation happened is south of the curve.
 Q: And the berms, are they improved berms?
 A: Yeah. There's a little bit of asphalt, just a small section of asphalt.
 Q: All right.
 A: It gets wider south of [State Route] 365. It gets real wide, but that's not where this happened.
 Q: So this was * * * where the narrow berm is?
 A: Yes.
(Suppression Hearing Tr. p. 6).
 {¶ 7} Trooper Ehrenborg continued that after his initial observation of Phillips' southbound vehicle, he "slowed, turned around and immediately caught up with [Phillips'] vehicle." (Suppression Hearing Tr. p. 7). Trooper Ehrenborg also testified, "While catching up, I noticed [Phillips'] vehicle * * * drift across the right [white] edge line again, and then * * * the driver slowed and put its (Sic.) signal on to turn left, or east." (Suppression Hearing Tr. p. 7). Trooper Ehrenborg continued that he observed Phillips' vehicle "just prior to turning [left] [go] across the right [white] edge line again." (Suppression Hearing Tr. p. 8). Additionally, Trooper Ehrenborg testified that when Phillips' vehicle passed him going southbound, it appeared that the Phillips' vehicle's rear license plate was not illuminated.
 {¶ 8} In addition to testimonial evidence, Trooper Ehrenborg's patrol car's videotape was introduced. The camera began recording a few seconds prior to Phillips' left turn and captured Phillips' performance of the field sobriety tests.
 {¶ 9} During cross-examination, Trooper Ehrenborg was questioned about Phillips' driving and testified as follows:
 Q: I take it from your testimony that other than driving over that [right] white [edge] line when you saw him first and then again twice over the [right] white [edge] line just before he turned left that there was no other improper driving.
 A: That was the only driving that I observed.
 Q: In other words, he wasn't weaving in * * * his lane of traffic, was he?
 A: He wasn't weaving in his lane, he was weaving out of his lane, so he would go over the [right] white edge line and come back in (Sic.) his lane.
 Q: You said in a mile he went over the [right] white edge line three times? I wouldn't call that weaving.
 A: Well, he'd have to weave to do that.
 Q: Certainly did not (Sic.) appear to you that he did not have good control of the vehicle, did it?
 A: Well, yes, sir. I wouldn't have stopped him. He's weaving, which he's going in his lane and out of his lane. The first time I see (Sic.) him he's out of his lane, then he goes back in his lane and back out of his lane.
 Q: At no time did he go off the paved portion of the highway?
 A: No sir.
(Suppression Hearing Tr. pp. 32-33).
 {¶ 10} While Trooper Ehrenborg did not provide specific testimony on the approximate distance Phillips' vehicle traveled outside the right white edge line, he did provide the following testimony during recross-examination after the videotape evidence of the traffic stop was introduced:
 Q: Now, * * * when [Phillips] was going down there and he made his left turn, I watched that two or three times. If he went on * * * the [right] white [edge] line, he just barely went on the [right] white [edge] line. He sure didn't go over it. * * *
 A: His tire is over. If his tire's over, if even just a half over, it's over.
(Suppression Hearing Tr. pp. 50-51).
 {¶ 11} Further, on cross-examination, Trooper Ehrenborg testified that he stopped Phillips' vehicle approximately three-quarters of a mile from where he initially observed Phillips' vehicle travel across the right white edge line. Trooper Ehrenborg also testified that he charged Phillips with failure to obey a traffic control device, but did not cite him for failing to have his rear license plate illuminated.
 {¶ 12} After the suppression hearing, the trial court found that the alleged lanes violations were not apparent from the videotape. Also, the trial court found that no other erratic driving was visible from the videotape. Additionally, the trial court, in granting Phillips' motion to suppress, noted:
 the facts presented are controlled by the line of appellate cases ruling that de minimus lane violations do not establish reasonable suspicion for a traffic stop in the absence of other evidence suggesting impairment. See State v. Gullett (1992), 78 Ohio App.3d 138.
 {¶ 13} It is from this decision that the State appeals, presenting the following assignment of error for our review:
 The trial court erred when it granted Appellee's motion to suppress where the totality of the circumstances at the scene gave the law enforcement officer reasonable suspicion that criminal activity was afoot.
 {¶ 14} In its assignment of error, the State argues that the trial court erred in determining that Trooper Ehrenborg lacked reasonable suspicion to stop Phillips' vehicle. Specifically, the State contends that Trooper Ehrenborg's observation of Phillips' vehicle crossing the right white edge line three times in a distance of approximately one mile was sufficient to allow him to initiate a traffic stop. Further, the State asserts that the totality of the circumstances surrounding the stop of Phillips' vehicle created a reasonable suspicion that Phillips was driving while impaired. We disagree.
 I. Standard of Review {¶ 15} When ruling on a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented.State v. Johnson (2000), 137 Ohio App.3d 847, 850. An appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. State v. Dunlap, 73 Ohio St.3d 308, 314,1995-Ohio-243. However, an appellate court must also conduct a de novo review of the trial court's application of the law to the facts.State v. Hodge, 147 Ohio App.3d 550, 2002-Ohio-3053, at ¶ 9.
 II. Constitutional Traffic Stops {¶ 16} The Fourth Amendment of the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures. Neither the Fourth Amendment of the United States Constitution nor Section 14, Article I of the Ohio Constitution explicitly provides that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court held that the exclusion of evidence is an essential part of theFourth Amendment. Mapp v. Ohio (1961), 367 U.S. 643, 649; Weeks v.United States (1914), 232 U.S. 383, 394. The primary purpose of the exclusionary rule is to remove the incentive to violate theFourth Amendment and thereby deter police from unlawful conduct. State v.Jones, 88 Ohio St.3d 430, 435, 2000-Ohio-374.
 {¶ 17} The temporary detention of a person during a traffic stop is a seizure. State v. Downs, 6th Dist. No. WD-03-030, 2004-Ohio-3003, at ¶ 10, citing State v. Vass, 7th Dist. No. 01CA 4, 2002-Ohio-6887, at ¶ 12, citing Delaware v. Prouse (1979), 440 U.S. 648. And, there are two different types of traffic stops, each requiring a different constitutional standard to be lawful. State v. Moeller (Oct. 23, 2000), 12th Dist. No. CA99-07-128.
 A. Stops Based On Probable Cause {¶ 18} The first kind of constitutional traffic stop occurs when a police officer witnesses a violation of the traffic code and stops the motorist to issue a citation, a warning, or to effect an arrest. For this type of traffic stop to occur, the heightened standard of probable cause must underlie the stop. Bowling Green v. Godwin,110 Ohio St.3d 58, 2006-Ohio-3563, at ¶ 13, quoting Gaddis ex rel. Gaddis v. RedfordTwp. (E.D.Mich. 2002), 188 F.Supp.2d 762, 767. "Probable cause is determined by examining historical facts, i.e., the events leading up to a stop or search, `viewed from the standpoint of an objectively reasonable police officer.'" Godwin, 2006-Ohio-3563, at ¶ 14, quotingOrnelas v. United States (1996), 517 U.S. 690, 696. "Probable cause" is "a reasonable ground for belief of guilt." State v. Moore,90 Ohio St.3d 47, 49, 2002-Ohio-10. In this type of stop, the determination of probable cause "like all probable cause determinations, is fact-dependent and will turn on what the officer knew at the time hemade the stop." Godwin, 2006-Ohio-3563 at ¶ 14, quoting Dayton v.Erickson, 76 Ohio St.3d 3, 10, 1996-Ohio-431, quoting United States v.Ferguson (C.A.6, 1993), 8 F.3d 385, 391, (emphasis in original). Additionally, probable cause is provided when an officer had probable cause to believe that a traffic violation has occurred or was occurring.Moeller, supra; see Erickson, 76 Ohio St.3d at 3, syllabus ("Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity. (United States v. Ferguson [C.A.6, 1993], 8 F.3d 385, applied and followed.)"); see, also, Whren v. United States (1996),517 U.S. 806, 819 ("Here the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment, the evidence thereby discovered is admissible * * *.").
 B. Stops Based On a Reasonable Articulable Suspicion {¶ 19} The second kind of constitutional traffic stop is an investigatory stop. The Ohio Supreme Court has held that the question of whether an investigatory traffic stop is reasonable requires an "objective assessment of a police officer's actions in light of the facts and circumstances then known to the officer." Erickson,76 Ohio St.3d at 6 (citation omitted). An investigatory stop is the motorized equivalent of a "Terry" stop, id.; see Terry v. Ohio (1968), 392 U.S. 1, and requires satisfaction of the "Terry" standard to be constitutionally acceptable: "articulable and reasonable suspicion" that an offense has been or is being committed. Prouse, 440 U.S. at 673. The lesser standard of reasonable articulable suspicion is defined as the ability of the officer "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 20-21.
 III. Did the Trooper Have Probable Cause to Stop Phillips?
 {¶ 20} Reviewing this case de novo, we must determine whether Trooper Ehrenborg had probable cause and/or a reasonable articulable suspicion to stop Phillips. We begin by determining whether Trooper Ehrenborg was able to initiate a traffic stop based on probable cause that a traffic offense had occurred or was occurring.
 A. R.C. 4511.12 Failure to Obey a Traffic Control Device
 {¶ 21} In the case sub judice, Trooper Ehrenborg stopped and cited Phillips for failure to obey a traffic control device in violation of R.C. 4511.12. R.C. 4511.12 provides, in pertinent part:
 (A) No pedestrian, driver of a vehicle, or operator of a streetcar or trackless trolley shall disobey the instructions of any traffic control device placed in accordance with this chapter, unless at the time otherwise directed by a police officer.
(Emphasis added).
 {¶ 22} In interpreting a criminal statute, courts must construe the statute strictly against the State and liberally in favor of the accused. R.C. 2901.04(A); State v. Gray (1992), 62 Ohio St.3d 514, 515,State v. Fuqua, 3d Dist. No. 6-02- 01, 2002-Ohio-4697, at ¶ 16, citing R.C. 2901.04(A).
 {¶ 23} We begin by finding that the right white edge line falls within the statutory definition of a traffic control device. A traffic control device is defined as "all flaggers, signs, signals, markings, and devices placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning, or guiding traffic * * *." R.C. 4511.01(QQ).
 {¶ 24} Reading the explicit language of R.C. 4511.01(QQ), it is clear that the right white edge line falls within the statutory definition of a traffic control device. First, the right white edge line is a marking intended to guide and warn traffic. Second, the right white edge line guides traffic by giving motorists a visual aid regarding the path of the roadway. Also, the right white edge line warns motorists of the fact that they may be approaching the edge of the paved portion of the roadway. Further, it is undisputed that a public body or official with the proper jurisdiction placed the right white edge line on the pavement.
 {¶ 25} In addition to the explicit language of R.C. 4511.01(QQ), the 2003 Ohio Manual of Uniform Traffic Control Devices (hereinafter referred to as "OMUTCD") supports our finding.[2] Specifically, the third part of the OMUTCD, entitled "Markings", includes the white edge line along the right side of a roadway. See OMUTCD 3-1 through 3-90.
 {¶ 26} However, a proper analysis of R.C. 4511.12(A) does not stop there. R.C. 4511.12(A) prohibits any driver of a vehicle from disobeying the instructions of a traffic control device. Since R.C. 4511.12(A) does not define "instructions", we must interpret what it means.
 {¶ 27} "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." R.C. 1.42. American Heritage Dictionary defines "instructions" as "[a]n authoritative direction to be obeyed; an order." American Heritage Dictionary (3 Ed. 1996) 936. Based on this definition, we must decide what "instructions", if any, a white edge line along the right side of a roadway provides to the operator of a vehicle.
 {¶ 28} We begin by noting that the Legislature has not enacted a statute which indicates that a right white edge line instructs an operator of a vehicle. However, the Legislature has had multiple opportunities to indicate that the right white edge line instructs vehicle operators to avoid crossing it; however, when enacting, for example, R.C. 4511.28, entitled "Permission to overtake and pass on the right", the Legislature failed to reference the right white edge line or any instructions the right white edge line provides. See, also, R.C.4511.01(BB), (EE) (providing the definitions of "Street" or "Highway" and "Roadway" respectively without reference to the right white edge line); R.C. 4511.25(B)[3] (providing that vehicles proceeding at less than the normal speed shall be driven either "in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway" without reference to the right white edge line).
 {¶ 29} Additionally, there are many locations, especially near intersections, where one roadway joins another but does not continue thru an intersection, where the pavement has been widened to allow vehicles to pass to the right of a vehicle which is waiting to make a left turn. See R.C. 4511.28(A)(1). However, in these instances, the right white edge line continues in a straight line and passing to the right of the vehicle would require the passing vehicle to cross the right white edge line. Therefore, any interpretation that a right white edge line instructed operators of vehicles not to cross it would be inconsistent with the Legislature's specific provision allowing the crossing of the right white edge line provided under R.C. 4511.28. We also note that some roadways have wide areas to the right of the right white edge line for use by horse-drawn vehicles, which vehicles are also subject to any instructions of a traffic control device, and the State's suggested interpretation of R.C. 4511.12 would prohibit such driving.
 {¶ 30} This premise is also consistent with the OMUTCD. Section 3A.01 entitled "Functions and Limitations" provides:
 Markings on highways have important functions in providing guidance and information for the road user. Major marking types include pavement and curb markings, object markers, delineators, colored pavements, barricades, channelizing devices and islands. In some cases, markings are used to supplement other traffic control devices such as signs, signals and other markings. In other instances, markings are used alone to effectively convey regulations, guidance, or warnings in ways not obtainable by the use of other devices.
OMUTCD 3A.01. (Emphasis added).
 {¶ 31} Additionally, the OMUTCD does not provide any indication that a right white edge line instructs or orders road users not to cross it. Unlike stop signs, right turn only pavement markings, or wrong way signs, which provide instructions or orders for road users (for example to stop), a right white edge line informs road users that to the right of the line might have less structural strength than the adjacent roadway[4] or provides road users a guide to aid them during adverse weather or visibility conditions.[5] See Goodwin, 2006-Ohio-3563, at ¶ 5, (noting that three signs, a left-turn prohibition sign, a "DO NOT ENTER" sign, and a "WRONG WAY" sign all indicate prohibitions on and provide instructions to an operator of a vehicle). Also, Section 3B.04 entitled "White Lane Line and Right Edge Line Pavement Markings and Warrants" provides that "if used, the right edge line pavement markings shall consist of a normal solid white line to delineate the right edge of the roadway." OMUTCD 3B.04; see, also, OMUTCD 3A.05 (providing that white longitudinal pavement lines delineate the "right edge of the roadway"); OMUTCD 3B.06 ("If used, edge line pavement markings shall delineate the right or left edges of a roadway.") Finally, the only prohibition of crossing a white line is found in OMUTCD 3B.04, which provides, "Where crossing the lane line markings is prohibited, the lane line markings shall consist of two normal solid white lines." However, we note that a double solid white line is to be used only for "lane line" markings and not for "edge line" markings.
 {¶ 32} Accordingly, we find that the right white edge line provides guidance and information about the roadway and does not provide any instructions or orders to operators of a vehicle. Therefore, when a motorist crosses the right white edge line, he or she is not "disobeying the instructions" of a traffic control device, because the right white edge line does not provide any instructions.
 {¶ 33} Having found that the right white edge line is a traffic control device, but does not provide any instructions, we find that driving over the right white edge line, without more, does not and should not result in a violation of R.C. 4511.12(A).[6] Accordingly, Phillips' alleged driving over the right white edge line does not constitute a traffic violation, and the legality of Phillips' traffic stop cannot be based on probable cause of a violation of R.C.4511.12(A).
 B. R.C. 4513.05 Failure to Illuminate the Rear License Plate
 {¶ 34} In the case sub judice, Trooper Ehrenborg testified that he also commenced Phillips' traffic stop because the rear license plate of Phillips' vehicle was not illuminated. If this was the case, Phillips would have been in violation of R.C. 4513.05 and Trooper Ehrenborg would have had probable cause to stop Phillips' vehicle. See State v.Held (2001), 146 Ohio App.3d 365. R.C. 4513.05(A) provides in pertinent part:
 Either a tail light or a separate light shall be so constructed and placed as to illuminate with a white light the rear registration plate, when such registration plate is required, and render it legible from a distance of fifty feet to the rear. Any tail light, together with any separate light for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlights or auxiliary driving lights are lighted, except where separate lighting systems are provided for trailers for the purpose of illuminating such registration plate.
 {¶ 35} We begin by noting that Trooper Ehrenborg did not cite Phillips for a violation of R.C. 4513.05(A), nor did he mention this observation to Phillips at any time prior to Phillips' arrest. Additionally, Trooper Ehrenborg admitted that he never checked to determine whether the rear license plate was actually illuminated after stopping Phillips' vehicle. Further, James A. Packer, who examined Phillips' vehicle the day after the traffic stop, testified that the rear license plate lights were working. Finally, reviewing the videotape, we agree with the trial court which stated, "[i]t is not apparent from the videotape that the license plate light was nonfunctional."
 {¶ 36} Accordingly, the legality of Phillips' traffic stop could not be based on probable cause of a violation of R.C. 4513.05(A), because there was no competent credible evidence to support a violation of R.C.4513.05(A).
 C. R.C. 4511.33(A) mdash Marked Lanes Violation {¶ 37} As discussed above, we found that crossing the right white edge line was not a violation of R.C. 4511.12. Additionally, there was no competent, credible evidence presented at the suppression hearing to support a finding that Phillips violated R.C. 4513.05(A). Therefore, we are left to determine whether Phillips' alleged crossing of a right white edge line was a violation of any other traffic law. See State v.Haynes, 11th Dist. No. 2003-A-0055, 2004-Ohio-3514, at ¶¶ 16-17
(concluding that the trial court's error was harmless, because the Officer had testified to events, which he did not cite defendant for, that would have given him probable cause to effectuate the traffic stop on defendant); State v. Molk, 11th Dist. No. 2001-L-146, 2002-Ohio-6926 (concluding that even if appellant were able to contradict the officer's testimony regarding a speeding violation, the officer would still have sufficient justification to initiate a stop due to appellant's smoking exhaust violation).
 {¶ 38} Under the facts of this case, our attention turns to R.C.4511.33(A)(1) for a potential violation of Ohio traffic law.[7] Based on the following, we hold that crossing the right white edge line is not a violation of R.C. 4511.33(A)(1); therefore, Trooper Ehrenborg could not have had the requisite probable cause to commence a lawful traffic stop based on a violation of R.C. 4511.33(A).
 {¶ 39} R.C. 4511.33, entitled "Rules for driving in marked lanes", provides in pertinent part:
 (A) Whenever any roadway[8] has been divided into two or more clearly marked lanes for traffic, * * * the following rules apply:
 (1) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.
 {¶ 40} We begin by noting that R.C. 4511.33 is patterned after Section 11- 309(a) of the Uniform Vehicle Code authored by the National Committee on Uniform Traffic Laws and Ordinances. See Unif. Vehicle Code § 11-309(a) (2000).[9] Since it is desirable to conform interpretations of a uniform law to those of our sister states who have adopted similar laws, we have considered the authorities from other states. See, e.g., Edward A. Kemmler Memorial Found. v. 691/733 East Dublin-Granville Road Co. (1992), 62 Ohio St.3d 494, 499 ("[S]ince it is desirable to conform our interpretations of the Uniform Commercial Code to those of our sister states, we have considered the authorities from other states more fully than is customary.")
 {¶ 41} Upon our review of Ohio's and other states' case law, we have found two different interpretations of R.C. 4511.33(A)(1). The first interpretation, which at some point has been adopted by the Fifth, Sixth, Ninth, and Tenth Districts, requires that a violation of R.C.4511.33(A)(1) include both that the driver stay within his or her lane or line of traffic and that the driver's movement between lanes or lines of traffic is not safe or is not made safely. See R.C. 4511.33(A)(1);State v. Barner, 9th Dist. No. 04CA0004-M, 2004-Ohio-5950, at ¶ 14 ("It is clear from a plain reading of the statute that in order to sustain a conviction pursuant to R.C. 4511.33(A), the State must put forth evidence that the driver of a vehicle moving either between lanes of traffic or completely out of a lane of traffic failed to ascertain the safety of such movement prior to making the movement."); State v.Downs, 6th Dist. No. WD-03-030, 2004-Ohio-3003, at ¶ 22 ("[W]e cannot see how appellant could have committed an offense [under R.C. 4511.33] which is predicated on the offender's vehicle in relationship to other vehicles. * * * R.C. 4511.33 * * * clearly permit[s] crossing from one lane to another when traffic allows. Absent traffic there is no offense."); State v. Hays (Oct. 17, 2001), 5th Dist. No. 01-CA-14-2 ("R.C. 4511.33(A) requires a driver making a lane change to do so only if it is safe to do so."); State v. East (June 28, 1994), 10th Dist. Nos. 93APC09-1307, 93APC09-1308 ("R.C. 4511.33(A) does not proscribe all movements across lane lines. Rather, it apparently is intended to require, as nearly as 'practicable,' that a driver maintain his vehicle in one lane of travel, and if a change of lanes is to be made, the driver first must ascertain that it can be made with safety. As a result, a driver's simply crossing a lane line in itself is insufficient to establish a prima facie violation of R.C. 4511.33(A); the evidencemust address additional conditions of practicality and safety, for whichthe state bears the burden of proof.") (emphasis added); State v.O'Harra (Sept. 17, 1974), 10th Dist. No. 74AP-174, 1974 WL 184311
(Interpreting an older version of R.C. 4511.33(A)[10] provides, "R.C.4511.33(A) is one of a class of statutes that merely requires that the operator of a motor vehicle operate it in a safe manner. R.C. 4511.33(A) prohibits the changing of lanes `until the driver has first ascertained that such movement can be made with safety.'").
 {¶ 42} This interpretation has also been adopted by courts in Pennsylvania, Maryland, Montana, Texas, Florida, and Maine with virtually identical statutory language to R.C. 4511.33(A)(1).[11] SeeCommonwealth v. Gleason (Pa. 2001), 785 A.2d 983 (reinstating the trial court's order granting appellant's motion to suppress, the Pennsylvania Supreme Court stated that crossing the fog line by six to eight inches on two or three occasions for a period of a second or two over a distance of about one-quarter of a mile was not a violation of Section 3309(1) of the Pennsylvania Vehicle Code[12], because appellant's driving did not create a safety hazard); Rowe v. State (Md. 2001),769 A.2d 879, 884-85 ("Focusing on the plain language of [MD Code, Trans., § 21-309][13], to be in compliance, a vehicle must be driven as much as possible in a single lane and movement into that lane from the shoulder or from that lane to another one cannot be made until the driver has determined that it can be done safely.") (citations omitted);State v. Lafferty (Mont. 1998), 967 P.2d 363, 366, 1998 MT 247, at ¶ 14 ("In our view * * * the statute[14] relates to moving from a marked traffic lane to another marked traffic lane. Here, Lafferty did not move from one of the marked eastbound traffic lanes on Highway 90 to the other without checking to be sure she could do so safely. She merely crossed onto and barely over the fog line on the far right side of the right traffic lane in which she was traveling. We conclude that this driving was not 'illegal' driving under § 61-8-328 * * *.");Hernandez v. State (Tex.App. 1998), 983 S.W.2d 867, 870-71 ("We believe the statutory language shows a legislative intent that a violation of section 545.060[15] occurs only when a vehicle fails to stay within its lane and such movement is not safe or is not made safely.
Neither the current provision in the Transportation Code nor the original statute creates two separate offenses, but rather only one: moving out of a marked lane when it is not safe to do so.") (emphasis in original); Crooks v. State (Fla.App. 1998), 710 So.2d 1041, 1043
("Because the record does not establish how far into the right-hand emergency lane Mr. Crooks drove on any of the three occasions, there is no basis to state that he was outside the 'practicable' lane. Even if he was briefly outside this margin of error, there is no objective evidence suggesting that Mr. Crooks failed to ascertain that his movements could be made with safety. Section 316.089[16] is similar to section316.155, Florida Statutes (1995), governing the use of turn signals, in that a violation does not occur in isolation, but requires evidence that the driver's conduct created a reasonable safety concern."); State v.Caron (Me. 1987), 534 A.2d 978, 979 ("A vehicle's brief, one time straddling of the center line of an undivided highway is a common occurrence and, in the absence of oncoming or passing traffic, without erratic operation or other unusual circumstances, does not justify an intrusive stop by a police officer.") We further note that the cited interpretations clearly appear to be based upon the premise that the statutes were intended to regulate travel from one lane of traffic into another lane of traffic, not travel into an "emergency lane" or across a "fog line."
 {¶ 43} The second interpretation of R.C. 4511.33(A)(1) provides two separate requirements. First, operators of vehicles must drive within a single lane or line of traffic as nearly as practicable. Second, operators of vehicles may not move from a lane or line of traffic until the operator has determined that it can be done with safety. This second interpretation concludes that not satisfying either requirement is a violation of the statute. See, e.g., Hodge, 147 Ohio App.3d 550,2002-Ohio-3053, at ¶ 50, (finding that the trial court did not err in overruling Hodge's motion to suppress, the Seventh District stated that the police officer witnessed Hodge commit a readily apparent traffic violation "[because] [Hodge] left the lane in which he was traveling when it was practicable to stay within his own lane of travel" and did not rely on whether Hodge's movements were safe.); State v. Horner (July 24, 1996), 9th Dist. No. 2533-M ("R.C. 4511.33(A) requires that vehicles drive within a single lane of traffic." Thus, the trooper observing Horner's "vehicle weave over the edge line onto the berm, then serve (Sic.) back across the lane and cross the center line" witnessed a traffic violation, which justified the trooper making the stop.) This interpretation has also been adopted by Illinois, which has a statute virtually identical to R.C. 4511.33(A)(1). See State v. Smith (Ill. 1996), 665 N.E.2d 1215, 1218-19 ("The plain language of the statute[17] establishes two separate requirements for lane usage. First, a motorist must drive a vehicle as nearly as practicable entirely within one lane. Second, a motorist may not move a vehicle from a lane of traffic until the motorist has determined that the movement can be safely made. It follows that when a motorist crosses over a lane line and is not driving as nearly as practicable within one lane, the motorist has violated the statute.")
 {¶ 44} We also note that the Ohio Supreme Court had the opportunity to provide guidance on what constitutes a violation of R.C. 4511.33(A), when it decided State v. Wilhelm, 81 Ohio St.3d 444, 1998-Ohio-613. Instead, the Court decided the case in a one sentence opinion which read, "The judgment of the court of appeals is reversed on the authority of Dayton v. Erickson (1996), 76 Ohio St.3d 3, 665 N.E.2d 1091." Id.
 {¶ 45} According to the Twelfth District's Wilhelm opinion, the officer testified that he "observed [Wilhelm's] front and rear passenger-side tires cross the right edge line of the roadway three times." 12th Dist. No. CA96-12-272. Additionally, the officer testified that "[Wilhelm] only crossed one to two inches over the right edge line each time." Id. After witnessing Wilhelm's driving, the officer pulled Wilhelm over and administered three field sobriety tests. Id. Subsequently, Wilhelm was cited for driving under the influence of alcohol and failure to drive within marked lanes under R.C. 4511.33. Id. Wilhelm moved to suppress evidence of his intoxication on the grounds that the initial investigative stop was invalid, but his motion was denied. Id. Wilhelm entered a plea of no contest to the driving under the influence charge and was found guilty. Id.
 {¶ 46} In reversing the trial court's decision, the Twelfth District used our first interpretation of R.C. 4511.33(A). The Twelfth District's majority opinion provided:
 It is evident from the text of [R.C. 4511.33(A)] that not every instance of crossing the right edge line constitutes a traffic offense. Instead, the statute has a proviso. Driving outside a lane is excusable if driving entirely within the lane is not practicable and if the driver ascertains that leaving the lane can be done safely. For this reason, the propriety of stops justified by a marked lanes violation must be judged on a case-by-case basis. The record in this case is silent as to whether appellant was not driving within his lane "as nearly as [was] practicable" under the circumstances and whether he left the lane without ascertaining that it was safe to do so. Accordingly, we cannot state with certainty that he violated the conditions of the statute.
Id. (Emphasis in original).
 {¶ 47} However, it appears that Judge Powell used our second interpretation of R.C. 4511.33(A) in his dissenting opinion inWilhelm. Judge Powell stated, "The record indicates that Officer Smith witnessed appellant violate R.C. 4511.33 by driving his vehicle across the right-hand lane marker three times for no apparent reason. Smith was certainly justified at that point in stopping appellant's vehicle under the rule enunciated by the United States Supreme Court inWhren." Id. (Powell, P.J., dissenting) (citations omitted).
 {¶ 48} Unfortunately, the Ohio Supreme Court did not provide any guidance other than summarily overruling the Twelfth District'sWilhelm decision. Because the Ohio Supreme Court has not provided us with any facts or testimony which it might have considered to reach its conclusion, we are left to wonder what traffic violation actually gave the officer probable cause to pull Wilhelm over, or whether based on the facts of the case, the Court determined that there was a reasonable articulable suspicion of criminal activity. Additionally, the Ohio Supreme Court failed to provide any guidance as to which interpretation of R.C. 4511.33(A) is proper. Therefore, we do not believe the Ohio Supreme Court's decision in Wilhelm provides any authoritative value or guidance. But see, State v. Hale, 11th Dist. No. 2004-L-105,2006-Ohio-133, at ¶ 33; State v. Hicks, 7th Dist. No. 01 CO 42, 2002-Ohio-3207, at ¶¶ 25-32.
 {¶ 49} Accordingly, we believe that we are able to adopt and will adopt our first interpretation of R.C. 4511.33(A), which the Tenth District concisely stated in State v. East, 10th Dist. Nos. 93APC09-1307, 93APC09-1308, supra:
 R.C. 4511.33(A) does not proscribe all movements across lane lines. Rather, it apparently is intended to require, as nearly as "practicable," that a driver maintain his vehicle in one lane of travel, and if a change of lanes is to be made, the driver first must ascertain that it can be made with safety. As a result, a driver's simply crossing a lane line in itself is insufficient to establish a prima facie violation of R.C. 4511.33(A); the evidence must address additional conditions of practicality and safety, for which the state bears the burden of proof.
Id. (Citation omitted).
 {¶ 50} This two-pronged interpretation of R.C. 4511.33(A) is also consistent with many other states that have adopted the Uniform Vehicle Code. Further, we note that our decision today is in conflict with multiple years of this Court's precedent; however, we believe that our interpretation of the interplay between R.C. 4511.33, the so-called "marked lanes" violation, and constitutional traffic stops is proper. Nevertheless, we explicitly limit our holding to vehicles which only cross the right white edge line, commonly known as the fog line, on a divided two-lane roadway.[18]
 {¶ 51} We find that our two-pronged interpretation of R.C. 4511.33(A) is proper for the following reasons. First, this was the interpretation of R.C. 4511.33(A) in many jurisdictions prior to and after theWhren and Erickson decisions. See State v. Barner, supra (decided in 2004); State v. Downs, supra (decided in 2004); State v. East, supra (decided in 1994); State v. O'Harra, supra (decided in 1974). Second, this interpretation has been adopted by other states which have similar statutes. Finally, this interpretation based upon common experience seems most reasonable. We will address each reason separately.
 1. Interpretation of R.C. 4511.33(A) Prior to Whren and Erickson
 {¶ 52} Prior to the Erickson and Whren decisions, the Fourth District decided State v. Gullett (1992), 78 Ohio App.3d 138. InGullett, the Fourth District determined that, based on the totality of the circumstances, the investigatory stop of a vehicle was not justified by sufficient articulable facts. Id. at 145. The facts inGullet demonstrated that the police officer stopped the defendant's vehicle after observing the vehicle cross the right white edge line on two separate occasions. Id. at 140. These two separate incidents occurred over a distance of approximately a mile and a half. Id. No further evidence of erratic driving was established. Id. at 141. Based on the investigatory stop, the defendant was charged with a marked lanes violation, in violation of R.C. 4511.33(A), and driving under the influence, in violation of R.C. 4511.19(A)(1). Id.
 {¶ 53} In Gullett, the Fourth District determined that where a vehicle is driven on a roadway with no other traffic present, and there are no other signs of erratic driving or speeding, except the edge line incidents, the right of privacy outweighs the necessity of a stop. Id. at 145. Accordingly, the Gullett Court held that, based upon the totality of the circumstances, there were insufficient articulable facts and inferences which would constitutionally justify the stop. Id.
 {¶ 54} Additionally, the Seventh District decided State v. Drogi
(1994), 96 Ohio App.3d 466, overruled by Hodge, 147 Ohio App.3d 550,2002-Ohio-3053 at ¶ 27, prior to the Erickson and Whren decisions. InDrogi, the Seventh District held that insubstantial drifts across lane lines do not give rise to a reasonable and articulable suspicion sufficient to make a traffic stop. Id. at 469-70. In Drogi, the trooper observed Drogi's vehicle's left front tire drive one foot over the center line, "then went right towards the edge line, then left without crossing the center line and eventually across the right edge line." Id. at 467.
 {¶ 55} After Gullett and Drogi were decided, the Ohio Supreme Court decided Erickson and the United States Supreme Court decidedWhren. The Ohio Supreme Court's decision in Erickson and the United States Supreme Court's decision in Whren both were decided on the principal that "pretextual" stops were constitutional as long as the police officer had probable cause that a traffic violation has occurred.Erickson, 76 Ohio St.3d at 3, syllabus; Whren, 517 U.S. at 810. Therefore, as long as a police officer has "probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." Erickson, 76 Ohio St.3d at 11-12. Unlike the motorist in Erickson, who failed to use his turn signal, which is a more "bright-lined"/easily determined violation of law, Phillips allegedly has failed to comply with R.C. 4511.33(A), the so-called "marked lanes" statute.
 {¶ 56} As noted before, R.C. 4511.33(A) requires that a motorist driveas nearly as practicable within his lane or line of travel and not move from that lane or line of travel until the motorist has first determined that it can be done with safety. See R.C. 4511.33(A). When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need for this court to apply the rules of statutory interpretation. State ex rel Jones v. Conrad, 92 Ohio St.3d 389, 392,2001-Ohio-207 (citations omitted). "In such a case, we do not resort to rules of interpretation in an attempt to discern what the General Assembly could have conclusively meant or intended in * * * a particular statute — we rely only on what the General Assembly has actually said." Id., citing Muenchenbach v. Preble Cty., 91 Ohio St.3d 141, 149,2001-Ohio-244 (Moyer, C.J., dissenting). "Where a statute is found to be subject to various interpretations, however, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." Meeks v. Papadopulos (1980), 62 Ohio St.2d 187, 190. If interpretation is necessary, the Legislature has expressly provided that courts should interpret statutory terms and phrases according to their common and ordinary (or, if applicable, technical) usage. R.C. 1.42. Words and phrases in a statute shall be read in context, and effect must be given to the entire statute. R.C.1.42; State ex rel. Moss v. Ohio State Hwy. Patrol Retirement Sys.,97 Ohio St.3d 198, 2002-Ohio-5806, at ¶ 20. "In the construction of statutes the purpose in every instance is to ascertain and give effect to the legislative intent, and it is well settled that none of the language employed therein should be disregarded, and that all of the terms used should be given their usual and ordinary meaning and signification except where the lawmaking body has indicated that the language is not so used." Weaver v. Edwin Shaw Hosp.,104 Ohio St.3d 390, 2004-Ohio-6549, at ¶ 12, quoting Carter v. Youngstown Div. ofWater (1946), 146 Ohio St. 203, paragraph one of the syllabus.
 {¶ 57} Therefore, because of the way that R.C. 4511.33(A) has been drafted, not every crossing of a right white edge line is a violation of the law per se for at least two reasons. First, a minor crossing of the right white edge line could fall within the "nearly as practicable" exception of R.C. 4511.33(A). And, second, movements from a lane or line of travel are not violations of law, unless the motorist has not first ascertained that the change of lanes can be done with safety. Nevertheless, our sister districts and this Court have consistently decided that any crossing of the right white edge line is a violation of R.C. 4511.33(A) and would give police officers probable cause to commence a traffic stop.
 {¶ 58} Ohio case law began to drift away from our two-pronged interpretation of R.C. 4511.33(A) in State v. Johnson (1995),105 Ohio App.3d 37, overruled by State v. Moeller (Oct. 23, 2000), 12th Dist. No. CA99-07-128, 2000 WL 1577287. In Johnson, the Twelfth District stated:
 [I]n interpreting R.C. 4511.33, the court in State v. Gullett (1992), 78 Ohio App.3d 138, 144-145, 604 N.E.2d 176, 180-81, concluded that while a mere crossing of the right edge line technically constitutes a marked-lane violation, it does not follow that every crossing of the edge line, regardless of circumstances, constitutionally justifies a stop of the vehicle. In Gullett, the court upheld a motion to suppress evidence in connection with a DUI charge where the defendant was stopped for twice crossing the right-edge line, and the evidence failed to show how long or how far the defendant crossed the line or any other evidence of erratic driving. Id. at 145, 604 N.E.2d at 181. As Gullett indicates, where a driver commits only a de minimis marked-lanes violation, some other evidence to suggest impairment is needed before an officer is justified in stopping the vehicle.
105 Ohio App.3d at 40-41. (Emphasis in original and footnote omitted).
 {¶ 59} It would appear that the Twelfth District made an unwarranted extension of the language and intention of the Fourth District'sGullett decision, when it provided that "Gullett indicates, where a driver commits only a de minimis marked-lanes violation, some other evidence is needed before an officer is justified in stopping the vehicle." Id. at 41. As we discuss below, this unwarranted extension allowed Ohio courts to conclude that a "de minimis" crossing of a right white edge line, without more, gives an officer probable cause to stop a vehicle. See Hodge, 147 Ohio App.3d 550, 2002-Ohio-3053. We also note that in reaching this interpretation of Gullett, the Twelfth District stated that the pertinent part of R.C. 4511.33(A) was "[a] vehicle * * * shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic * * *", id. at 41 ft.n. 3, unfortunately, ignoring the "safety" prong of the statute.
 {¶ 60} The drift away from our two-pronged interpretation of R.C.4511.33(A) continued in the Fourth District's decision in State v.Brite (1997), 120 Ohio App.3d 517, discretionary appeal not allowed in (1997), 80 Ohio St.3d 1426. In Brite, the Fourth District reasoned:
 The officer testified below that his sole reason for making the investigatory stop was that he had observed appellant's car drive over the right-hand edge line of the road on two occasions during the span of a mile. It was unclear, however, just how far over the edge line appellant's car had gone. Moreover, [the officer] testified that appellant never went left of center, was not speeding, and violated no other traffic laws. We find as a matter of law that these two instances of crossing the right-hand edge line of the road, without more, were insufficient to justify a stop of the vehicle.
Id. at 521. (Emphasis added and footnote omitted). However, in Judge Harsha's concurring opinion, he stated that "[t]he significance ofErickson and Whren lies in their holding that even technical violations of the law provide a basis for seizures by law enforcement officials." Id. at 522-23 (Harsha, J., concurring). Judge Harsha continued,
 The implication of these decisions is that if a motorist is violating a traffic law, even in a minor aspect, i.e., traveling fifty-eight m.p.h. in a fifty-five m.p.h. zone, an officer is justified in making the stop. One could plausibly argue that even the slightest crossing of the white "fog line" on a highway results in a technical violation of R.C. 4511.33 * * *.
Id. at 523. Also, Judge Harsha stated, "Certainly, even a momentary "bobble" could give rise to a reasonable, articulable suspicion, if not probable cause, to believe R.C. 4511.33 had been violated in light of the holding and rationale in Erickson and Whren." Id.[19]
 {¶ 61} The drift away from our two-pronged interpretation of R.C.4511.33(A) was completed when the Seventh District decidedHodge, 147 Ohio App.3d 550, 2002-Ohio-3053. In Hodge, the Seventh District concluded that any violation of the law regardless of the degree of violation is still a violation of the law. Id. at ¶ 27. Specifically, the Seventh District reasoned:
 Before today, this court has undertaken an analysis on a case-by-case basis of whether each instance of crossing a lane was a violation of the law, and consequently reasonable suspicion to justify a stop. In the following instances, this court continued to distinguish Drogi from the case being decided, and held the stop was constitutionally valid.
 In determining whether law enforcement has had the requisite reasonable suspicion to make an investigatory stop, this court has been mired down in deciding factual scenarios such as "insubstantial drifts" across the right-edge line; the distance traveled by the driver and how far the vehicle traveled over the edge line; and whether nine seconds was enough time for an officer to have observed a vehicle swaying between lanes before stopping the motorist. Further, in Drogi, the opinion specifically noted that the driver " * * * was driving his vehicle, for the most part, within a single lane of traffic on a four lane divided highway."
 In each instance we are in effect second-guessing whether a violation rose to the level of being "enough" of a violation for reasonable suspicion to make the stop. Pursuant to Whren and Erickson, we must recognize that a violation of the law is exactly that-a violation. Trial courts determine whether any violation occurred, not the extent of the violation. Based upon the foregoing analysis, we explicitly overrule Drogi, as it is contrary to the subsequent decisions of Whren and Erickson.
Id. at ¶¶ 25-27. (Citations omitted).
 {¶ 62} In addition, the Seventh District specifically addressed R.C.4511.33[20] and provided a thorough discussion ascertaining the meaning and legislative intent of the phrase "as nearly as practicable" stating:
 The legislature did not intend for a motorist to be punished when road debris or a parked vehicle makes it necessary to travel outside the lane. Nor, we are quite certain, did the legislature intend this statute to punish motorists for traveling outside their lane to avoid striking a child or animal. We are equally certain the legislature did not intend the statute to give motorists the option of staying within the lane at their choosing. Common sense dictates that the statute is designed to keep travelers, both in vehicles and pedestrians, safe. The logical conclusion is that the legislature intended only special circumstances to be valid reasons to leave a lane, not mere inattentiveness or carelessness. To believe that the statute was intended to allow motorists the option of when they will or will not abide by the lane requirement is simply not reasonable.
Id. at ¶ 43 (emphasis in original). However, we again stress that the Seventh District's analysis in Hodge fails to discuss the second prong of R.C. 4511.33(A), which requires that motorists first ascertain that it is safe to leave their lane or line of travel.
 {¶ 63} After the Seventh District's decision in Hodge, Ohio courts have consistently determined that any crossing of the right white edge line provides probable cause that a violation of R.C. 4511.33(A) has occurred.[21] Therefore, it has become a fairly consistent holding that whenever a police officer witnesses a motorist cross a right white edge line, regardless of how far, how long, or how many times the crossing occurred, the police officer is able to make an allegedly constitutional stop of the motorist, unless there was an external circumstance which caused the motorist to leave his or her lane or line of travel. See, e.g., State v. Schwieterman, 2d Dist. No. 1588, 2003-Ohio-615 at ¶ 13 ("Schwieterman committed an apparent traffic violation in the present case, as he crossed the right edge line three times when it appears to have been practicable for him to have stayed entirely within a single lane. As a result, [the officer] was justified in making a traffic stop."); State v. Grimsley, 10th Dist. No. 02AP-502, 2003-Ohio-514, at ¶ 17 ("[D]ue to the repeated swerving, appellant was charged with failing to drive within her marked lane, a minor traffic offense in violation of R.C. 4511.33. Therefore pursuant to the law articulated in Whren and Dayton, * * * by witnessing the commission of a specific traffic offense, Trooper Munyon had probable cause to stop appellant."); and, State v. Simmons, 11th Dist. No. 2004-L-131,2005-Ohio-6706, at ¶¶ 4 25 ("Officer Stevenson noticed appellant's vehicle, which was directly in front of his cruiser, weave over the white solid line onto the shoulder of the right side of the freeway and back into the right lane on two separate occasions within a quarter of a mile. He indicated that in each instance, both wheels on the right side of appellant's car crossed completely over the white line by several inches. * * * In the case at bar, Officer Stevenson had probable cause to make the stop due to the R.C. 4511.33(A)(1) improper lane usage.") (Citations omitted).[22]
 {¶ 64} We also note that this Court has agreed, in dicta, with the Seventh District's analysis inHodge. See State v. Thompson, 3d Dist. App. Nos. 14-04-34, 14-04-35, 2005-Ohio-2053, at ¶ 12; State v.Lamb, 3d Dist. App. No. 14-03-30, 2003-Ohio-6997, at ¶¶ 8-11. Additionally, this Court has recognized that the holdings ofWhren and Erickson stand for the proposition that any de minimis violation is a violation of law. See Village of McComb v. Andrews, 3d Dist. No. 5- 99-41, 2000-Ohio-1663 ("While we recognize the existence of those cases holding essentially that a de minimis violation does not necessarily give a police officer reasonable suspicion to stop a vehicle, * * * we disagree with the general reasoning of those cases and note that such cases have effectively been overruled by the United States Supreme Court in Whren v. United States (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.E.2d 89, and the Ohio Supreme Court in Dayton v.Erickson (1996), 76 Ohio St.3d 3.").
 {¶ 65} Nevertheless, while we stand behind our decisions which have held that any violation of a traffic law, including de minimis traffic violations, give police officers the ability to make a constitutional stop of a motorist, we move away from our decisions which have held that any touching or crossing of a right white edge line, regardless of how major or minor, on its own, is a violation of law per se. In doing so, we adopt the two-pronged interpretation of R.C. 4511.33(A), which requires a police officer to witness (1) a motorist not driving his or her
vehicle within a single lane or line of travel as nearly as is practicable; and (2) a motorist not first ascertaining that it is safe to move out of that lane or line of travel before doing so, in order to have probable cause to constitutionally stop the motorist. While we recognize that this standard might be burdensome for both police officers and prosecutors, we believe that the Legislature did not intend for motorists to be "perfect" drivers, but rather "reasonable" drivers.
 2. Other States Support Our Two-Pronged Interpretation {¶ 66} In reaching this conclusion, we are further persuaded by the Maryland Court of Appeals' decision in Rowe v. State (2001),363 Md. 424. In Rowe, the Maryland Court of Appeals interpreted an essentially identical statute[23] to R.C. 4511.33(A)(1). Id. at 434. In doing so, the Rowe Court stated:
 Focusing only on the plain language of the statute, to be in compliance, a vehicle must be driven as much as possible in a single lane and movement into that lane from the shoulder or from that lane to another one cannot be made until the driver has determined that it can be done safely.
Id. The Rowe Court continued and we agree that "more than the integrity of the lane markings, the purpose of the statute is to promote safety on laned roadways." Id. Further, the Rowe Court noted that the purpose to promote safety is consistent with the statute's placement within its code. Id. Looking at the Ohio Revised Code, we agree that the placement of R.C. 4511.33(A)(1) within R.C. 4511.13, the remainder of which provides:
 (A) Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply: * * *
 (2) Upon a roadway which is divided into three lanes and provides for two-way movement of traffic, a vehicle or trackless trolley shall not be driven in the center lane except when overtaking and passing another vehicle or trackless trolley where the roadway is clearly visible and such center lane is clear of traffic within a safe distance, or when preparing for a left turn, or where such center lane is at the time allocated exclusively to traffic moving in the direction the vehicle or trackless trolley is proceeding and is posted with signs to give notice of such allocation.
 (3) Official signs may be erected directing specified traffic to use a designated lane or designating those lanes to be used by traffic moving in a particular direction regardless of the center of the roadway, or restricting the use of a particular lane to only buses during certain hours or during all hours, and drivers of vehicles and trackless trolleys shall obey the directions of such signs.
 (4) Official traffic control devices may be installed prohibiting the changing of lanes on sections of roadway and drivers of vehicles shall obey the directions of every such device.
 (B) Except as otherwise provided in this division, whoever violates this section is guilty of a minor misdemeanor. If, within one year of the offense, the offender previously has been convicted of or pleaded guilty to one predicate motor vehicle or traffic offense, whoever violates this section is guilty of a misdemeanor of the fourth degree. If, within one year of the offense, the offender previously has been convicted of two or more predicate motor vehicle or traffic offenses, whoever violates this section is guilty of a misdemeanor of the third degree.
comports with the purpose that R.C. 4511.33(A)(1) is in the Revised Code to promote safety on roadways which have been divided into two or more clearly marked lanes for traffic.[24]
 {¶ 67} Also, as noted above, our interpretation has also been adopted by other states which have statutes essentially similar to Ohio's version of the Uniform Vehicle Code. See Gleason, 785 A.2d 983;Lafferty, 967 P.2d 363; Hernandez, 983 S.W.2d at 870-71;Crooks, 710 So.2d 1041, 1043; and, Caron, 534 A.2d at 979. But, see,Smith, 665 N.E.2d 1215.
 3. Common Experience {¶ 68} Finally, common experience leads us to this two-pronged interpretation of R.C. 4511.33(A). Having spent many of miles on the road, driving between the counties of our district, we have followed many semi-trucks, cars, vans, and other vehicles, including law enforcement vehicles, which have crossed the right white edge line. In fact, we believe that reasonable drivers will inadvertently cross the right white edge line. They will do so because a reasonable driver will drive closer to the right white edge line than the center line, because crossing left into any oncoming traffic would generally be more dangerous. And, in doing so, reasonable drivers will inadvertently cross the right white edge line, for no other reason than to avoid crossing left into the opposing lane of traffic. See, also, State v. Korman, 11th Dist. No. 2004-L-064, 2006-Ohio-1795, at ¶ 42 ("The common habits of all drivers in going down steep hills, negotiating narrow roads, drifting to the right while adjusting the radio in the middle of the night, and keeping toward the center to avoid a dark and dangerous soft shoulder should not precipitate a traffic stop.") (O'Toole, J., dissenting). Furthermore, if police officers were to stop every driver who crossed over the right white edge line to issue a citation or a warning, the State of Ohio would not be able to employ enough police officers to enforce such a law, because it is so common that drivers cross the right white edge line.
 {¶ 69} Additionally, our interpretation of R.C. 4511.33(A) would use an updated definition of "practicable." In analyzing R.C. 4511.33, the Seventh District focused on the word "practicable" and stated that the Court "will use the ordinary definition and common sense."Hodge, 2002-Ohio-3053, at ¶ 39. In doing so, the Seventh District relied on the Tenth District's definition of practicable in Columbus v.Truax (1983), 7 Ohio App.3d 49. In Truax, the Tenth District stated:
 Black's Law Dictionary (5 Ed.1979) defines "practicable" as: "* * * that which may be done, practiced, or accomplished; that which is performable, feasible, possible * * *." Our review of the law of other jurisdictions indicates that other state courts generally agree with this definition.
 The Ohio Supreme Court has also defined "practicable" as "capable of being put into practice or accomplished," or something that is "reasonably possible."
Id. at 50-51 (citations omitted). In relying on this passage, the Seventh District used Black's Law Dictionary's definition of "practicable" instead of the Ohio Supreme Court's version. Thus, the Seventh District concluded that "insert[ing] the definition into the statute in place of the word 'practicable,' the statute would read: `(A) A vehicle or trackless trolley shall be driven, as nearly as is performable, feasible, possible, entirely within a single lane * * *.'"Hodge, 2002- Ohio-3053, at ¶¶ 39-40.
 {¶ 70} We disagree with the Seventh District's interpretation of "as nearly as practicable." The current version of Black's Law Dictionary comports with the Ohio Supreme Court's definition of practicable. Black's Law Dictionary (8 Ed. 2004) defines practicable as "reasonably capable of being accomplished; feasible." See State ex rel. Fast Co.v. Indus. Comm. (1964), 176 Ohio St. 199, 201. ("[Practicable] means capable of being put into practice or accomplished".) This definition has also been adopted by the Sixth District in State v. Noss (Nov. 30, 2000), 6th Dist. No. WD-00-016. In Noss, the Sixth District defined "`practicable' as 'capable of being put into practice or of being done or accomplished: FEASIBLE * * *.'" Id. Therefore, if we were to insert the definition, currently supported by the Ohio Supreme Court and Black's Law Dictionary, into the statute in place of the word "practicable", R.C. 4511.33(A)(1) would read: "A vehicle or trackless trolley shall be driven, as nearly as reasonably capable of being accomplished, entirely within a single lane or line of traffic * * *."
 {¶ 71} When read in this context, we believe the Seventh District has misinterpreted the legislative intent of R.C. 4511.33(A)(1). While we agree with the Seventh District that "the legislature did not intend for a motorist to be punished when road debris or a parked vehicle makes it necessary to travel outside the lane" and that "the legislature [did not] intend this statute to punish motorists for traveling outside their lane to avoid striking a child or animal", Hodge, 2002- Ohio-3053, at ¶ 45, we believe that the legislature did intend R.C. 4511.33(A) to give motorists the option of staying within their lane or line of traffic at their choosing, so long as the drivers are staying "as nearly as practicable, entirely within a single lane or line of traffic and the driver[s] ha[ve] first ascertained that such movement can be made with safety." R.C. 4511.33(A)(1).
 {¶ 72} We doubt anyone would argue that the Legislature intended to prohibit driving which would put pedestrians and travelers in danger. See e.g., State v. Hays (Oct. 17, 2001), 5th Dist. No. 01-CA-14-2 (interpreting R.C. 4511.33(A) in light of a traffic accident where Appellant crossed into a lane of traffic occupied by a semi-tractor trailer, the Fifth District stated, "R.C. 4511.33(A) requires a driver making a lane change to do so only if it is safe to do so. There is no requirement that other drivers slow to make room for a driver who wishes to change lanes. If the other vehicle is so close or traveling at a speed so as to require it to slow down to make room for the vehicle changing lanes, it may be inferred that it is not safe to make the lane change.") But, we do not agree with the Seventh District's "logical conclusion * * * that the legislature intended only special circumstances to be valid reasons to leave a lane, not mere inattentiveness or carelessness", Hodge, 2002-Ohio-3053, at ¶ 43. Rather, when we read the statute with the Ohio Supreme Court's definition of "practicable", we believe that the Seventh District's interpretation creates a standard which requires drivers to be perfect rather than reasonable.
 {¶ 73} Further, our contention has also been supported in Judge Harsha's concurring opinion in State/City of Nelsonville v.Woodrum, 4th Dist. No. 00CA50, 2001-Ohio-2650. In his concurring opinion, Judge Harsha stated and we concur that "de minimis weaving and/or crossing of the marked lanes does not always justify a traffic stop based upon either the Terry standard or probable cause[, because] of the 'as nearly as practicable' language of R.C. 4511.33(A)."Woodrum, supra (Harsha, J., concurring). Additionally, to strengthen his point, Judge Harsha concludes and we agree, "In other words, I construe that language to be the legislature's recognition that every de minimiscrossing of marked lanes is not a traffic violation." Id. (emphasis added). This interpretation, coupled with the second prong requiring that movements outside of the lane or line of travel shall not be completed without first ascertaining that doing so may be completed safely, reinforces our belief that crossing the right white edge line is not a violation of R.C. 4511.33(A) per se.[25]
 {¶ 74} Applying our two-pronged interpretation of R.C. 4511.33(A) to the case sub judice, we do not find that Phillips' crossing of the right white edge line was a violation of law. First, there is no evidence on the record which provided how far Phillips' vehicle was over the right white edge line. Second, there was no evidence to determine how long Phillips' vehicle was over the right white edge line. Therefore, other than Trooper Ehrenborg testifying that he observed Phillips cross the right white edge line three times over a period of about one mile, there is not competent credible evidence to determine whether Phillips was driving within his single lane or line of travel as nearly as is practicable. Additionally, there was no evidence as to whether there was additional traffic on the roadway or that Phillips' crossing of the right white edge line was done without him first ascertaining that it was safe to do so. Further, having viewed the videotape evidence, we note that the videotape is void of any traffic traveling in either direction on the roadway other than Phillips' vehicle and Ehrenborg's patrol car. Therefore, there is not competent credible evidence to determine whether Phillips' crossing of the right white edge line was done without him first ascertaining that it was safe to do so. Accordingly, the legality of Phillips' traffic stop could not be based upon the probable cause that there was a violation of R.C.4511.33(A)(1).
 D. Conclusion {¶ 75} Having found that Phillips' crossing the right white edge line was not a violation of R.C. 4511.12(A) or R.C. 4511.33(A)(1) and that there was not competent credible evidence to support a violation of R.C.4513.05(A), we need to determine whether Trooper Ehrenborg could have reasonably concluded from Phillips' driving that he was violating a traffic law. Erickson, 76 Ohio St.3d at 11- 12. Upon review of the record and viewing the videotape, we find that Phillips' actions do not give rise to a reasonable articulable suspicion sufficient to justify a stop of his vehicle.
 IV. Reasonable Articulable Suspicion {¶ 76} Because we find that crossing the right white edge line is not a violation of law, giving a police officer probable cause to stop a motorist, we need to determine whether Trooper Ehrenborg had the authority to commence an investigative traffic stop. See State v.Mortensen (Feb. 27, 1998), 6th Dist No. E-97-107 ("Although [R.C.4511.33(A)] permits some latitude in operating a vehicle within marked lanes, it does not mean that police can never have reasonable suspicion to stop a person driving a vehicle outside its marked lane.")
 {¶ 77} A police officer may make a brief, warrantless, investigatory stop of an individual where the officer reasonably suspects that the individual is or has been involved in criminal activity. Terry,392 U.S. 1. In assessing that conclusion, the officer must be able to point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant the intrusion. State v.Andrews (1991), 57 Ohio St.3d 86, citing Terry, supra. Whether an investigatory stop is reasonable depends upon the totality of the circumstances surrounding the incident. State v. Williams (1990),51 Ohio St.3d 58, 60.
 {¶ 78} In the case sub judice, we find that Trooper Ehrenborg was unable to point to specific and articulable facts, which would warrant the investigatory stop of Phillips' vehicle. While we recognize that Trooper Ehrenborg testified that during the early hours of the morning, Phillips crossed the right white edge line three times over a period of approximately three-quarters of a mile, absent more, we find that these facts alone are insufficient to conclude that Phillips' stop was reasonable.
 {¶ 79} Upon review of the record, we recognize the lack of certain facts which might have given rise to a reasonable articulable suspicion that criminal activity was afoot.[26] First, there is no testimony as to how far Phillips crossed the right white edge line. In fact, the only relevant testimony was Trooper Ehrenborg's in which he stated that if Phillips' tire had touched the right white edge line then he was over the line. Therefore, we are unable to determine exactly how far Phillips deviated from the left side of the white line to the right side of the white line, because of Trooper Ehrenborg's, ambiguous at best, testimony. Second, there was no testimony about the length of time Phillips' vehicle had crossed the right white edge line. Third, there was no testimony as to whether the movement of Phillips' vehicle gave Trooper Ehrenborg a suspicion that Phillips might have been tired or intoxicated. Specifically, Trooper Ehrenborg testified that he commenced the stop based upon only the alleged failure to obey a traffic control device and the apparent improper illumination of Phillips' vehicle's rear license plate, but he did not address whether Phillips' driving pattern gave him a suspicion that criminal activity was afoot. Finally, during the hearing, the State presented Trooper Ehrenborg's patrol car videotape of the traffic stop. The trial court specifically stated that the "alleged lanes violations are not apparent from the tape. Nor is other erratic driving visible." Since the videotape contained competent and credible evidence, we must uphold the trial court's findings of fact. See State v. Rennick, 7th Dist. No. 02 BA 19, 2003-Ohio-2560, at ¶ 20; City of Alliance v. Warfel (Nov. 19, 2001), 5th Dist. No. 2001 CA 134.
 {¶ 80} Accordingly, we find that the facts provided in the record are insufficient to conclude that Phillips' stop was reasonable, because Trooper Ehrenborg was unable to point to specific and articulable facts which, taken together with rational inferences from those facts and the totality of the circumstances surrounding the stop, reasonably warrant the intrusion.
 {¶ 81} Based on the above, we find that crossing over the right white edge line, by itself, is not a violation of R.C. 4511.12 or R.C.4511.33(A)(1), and that there was not competent credible evidence to support a violation of R.C. 4513.05(A); therefore, Trooper Ehrenborg did not have the requisite probable cause to stop Phillips. Additionally, we find that based upon the facts in the record, there was no reasonable basis for the stop of Phillips' vehicle. Accordingly, we affirm the trial court's ruling that the evidence gathered as a result of Phillips' traffic stop must be suppressed.
 {¶ 82} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
[1] We note that this motion to suppress relates only to the R.C.4511.19 charge.
[2] The OMUTCD was "developed pursuant to [R.C. 4511.09] to establish standards for the use of traffic control devices in the State of Ohio." OMUTCD I-1; see Godwin, 2006-Ohio-3563, at ¶ 4 (stating that the OMUTCD was adopted by the Ohio Department of Transportation under R.C. 4511.09).
[3] R.C. 4511.25(B) was amended on September 21, 2006 by 2006 H 386 to provide:
 (B)(1) Upon all roadways any vehicle or trackless trolley proceeding at less than the prevailing and lawful speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, and far enough to the right to allow passing by faster vehicles if such passing is safe and reasonable, except under any of the following circumstances:
 (a) When overtaking and passing another vehicle or trackless trolley proceeding in the same direction;
 (b) When preparing for a left turn;
 (c) When the driver must necessarily drive in a lane other than the right-hand lane to continue on the driver's intended route.
 (2) Nothing in division (B)(1) of this section requires a driver of a slower vehicle to compromise the driver's safety to allow overtaking by a faster vehicle.
[4] See MUTCD 3B.07 ("Edge line markings may be used where edge delineation is desirable to minimize unnecessary driving on paved shoulders or on refuge areas that have lesser structural pavement strength than the adjacent roadway.")
[5] See OMUTCD 3B.06 ("Edge line markings have unique value as visual references to guide road users during adverse weather and visibility conditions.").
[6] We note that our interpretation does not require us to consider, at this time, the requisite degree of culpability required for a driver to violate R.C. 4511.12(A).
[7] We note that Phillips was not stopped nor cited for a violation of R.C. 4511.33(A)(1); that the trial court specifically stated that the "alleged lanes violations are not apparent from the tape. Nor is other erratic driving visible"; and, that R.C. 4511.33(A)(1) was not at issue below nor was it briefed or argued by either party on appeal.
[8] Roadway is defined in R.C. 4511.01(EE), which states, "'Roadway' means that portion of a highway improved, designed, or ordinarily used for vehicular travel, except the berm or shoulder. If a highway includes two or more separate roadways the term 'roadway' means any such roadway separately but not all such roadways collectively."
[9] Unif. Vehicle Code § 11-309(a) (2000) states:
 Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply.
 (a) A vehicle shall be driven, as nearly as practicable, entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
[10] At the time of the O'Harra decision, R.C. 4511.33(A) provided:
 "Whenever any roadway has been divided into three or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:
 (A) A vehicle * * * shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety."
O'Harra, supra, 1974 WL 184311.
We note that R.C. 4511.33(A) has been amended three times since this opinion was written. However, the language under subpart (A) has remained the same.
[11] We note that the Ohio statute requires vehicles be driven as nearly as practicable, entirely within a "single lane or line" of traffic, while, as noted below, these other states' statutes require that vehicles be driven as nearly as practicable, entirely within a "single lane" of traffic. However, we are unable to find a persuasive reason why the addition of "or line" would change any of these states' interpretation of its respective marked lanes statute.
[12] 75 Pa. Cons. Stat. Ann. § 3309(1) provides:
 Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others not inconsistent therewith shall apply:
 (1) Driving within single lane. — A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety.
[13] Md. Code Ann., Trans., § 21-309 provides, in pertinent part:
 (a) On any roadway that is divided into two or more clearly marked lanes for vehicular traffic, the following rules, in addition to any others consistent with them, apply.
 (b) A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.
[14] Mont. Code Ann. § 61-8-328 provides, in pertinent part:
 Whenever a roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all other consistent rules, apply:
 (1) A vehicle must be operated as nearly as practicable entirely within a single lane and may not be moved from the lane until the operator has first ascertained that the movement can be made with safety.
[15] {The Texas Legislature first enacted a traffic regulation regarding "driving on roadways laned for traffic," in 1947, which provided:
 Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
 (a) The driver of a vehicle shall drive as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
(Tex.Rev.Civ.Stat. Ann. art. 6701d, § 60(a), since repealed and recodified at Tex. Transp. Code Ann. § 545.060(a) (West 1997)).
The recodified section provides:
 An operator on a roadway divided into two or more clearly marked lanes for traffic:
 (1) shall drive as nearly as practical entirely within a single lane; and
 (2) may not move from the lane unless that movement can be made safely.
Tex. Transp. Code Ann. § 545.060(a).
The recodified provision made no substantive change in the law. See Transportation Code, 74th Leg., R.S., ch. 165, § 25, 1995 Tex. Gen. Laws 1025, 1871; Hernandez, 983 S.W.2d at 871.
[16] Fla. Stat. Ann. § 316.089 provides, in pertinent part:
 Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in additional to all others consistent herewith, shall apply:
 (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
[17] 625 Ill. Comp. Stat. 5/11-709(a) provides:
 Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in additional to all others consistent herewith, shall apply.
 (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.
[18] We recognize that other courts have applied R.C. 4511.33(A)(1) to vehicles which have been driven across broken white lines, State v.Downs, 6th Dist. No. WD-03-030, 2004-Ohio-3003, at ¶¶ 3, 19-22, vehicles which have been driven across left edge lines, State v. Williams (June 18, 2001), 12th Dist. No. CA2000-11-029, as well as vehicles which have been driven across the yellow center line, see State v. Tarlton, 4th Dist. No. 02CA688, 2002-Ohio-5795, at ¶¶ 7-14. Based on the facts of this case, we are not presented with those situations and refrain from discussing them. However, we note that a strict application of those opinions would prohibit the changing of lanes on multi-lane highways except to avoid obstructions. We do not believe this to have been the legislature's intent.
[19] However, we note that the Fourth District in its decision inState v. Fields discusses Judge Harsha's concurring opinion inBrite. 4th Dist. No. 99 CA 11, ft.n. 3. In Fields, the Fourth District noted that the majority opinion made no pronouncement and Judge Harsha's concurring opinion stopped short of saying that a violation of R.C.4511.33(A) occurred in Brite. Id. The Fourth District continued, "because of the peculiar manner in which R.C. 4511.33(A) is drafted, we have not held that every instance of weaving warrants stopping a car for violation of the statute." Id. (Emphasis in original). We also note that the Fourth District still has not expressly overruled Brite, but attempted to in State v. Gunther, 4th Dist. No. 04CA25, 2005-Ohio-3492, at ¶ 16. However, in Gunther, the discussion of the assignment of error which overruled Brite was concurred in judgment only by a majority of the panel.
[20] We note that the Seventh District in Hodge analyzed an older version of R.C. 4511.33. In Hodge, R.C. 4511.33 read, in pertinent part:
 Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:
 (A) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.
R.C. 4511.33 was amended in 2002, under 2002 S 123, which "designated the existing introductory paragraph as a new division (A); redesignated prior divisions (A), (B), (C) and (D) as new divisions (A)(1), (2), (3) and (4); respectively; and added new division (B)." R.C. 4511.33
amendment note. R.C. 4511.33 was also amended in 2003, but those amendments do not affect the portion of the statute at issue in the case sub judice.
[21] We also note that districts held that any crossing of the right white edge line provides probable cause that a violation of R.C.4511.33(A) occurred before the Seventh District's decision inHodge. See, e.g., State v. Johnson, 1st Dist. Nos. C-010621, C-010622, 2002-Ohio-2884, at ¶ 9 ("The officer in this case observed Johnson's vehicle travel outside its lane three times within two-tenths of a mile. There was no external condition that would have caused or justified the deviation. The facts known to the officer at the time he made the stop were sufficient to constitute probable cause to believe Johnson had violated the law."); State/City of Nelsonville v. Woodrum, 4th Dist. No. 00CA50, 2001-Ohio-2650 ("Here, Officer McKnight clearly stated that he pulled appellant over because he had observed him driving outside his marked lane, in violation of R.C. 4511.33. Thus, our inquiry is complete: Officer McKnight had probable cause to stop appellant.");State v. Brush, 5th Dist. No. 04CA92, 2005-Ohio-3767, at ¶¶ 13-14,2005 WL 1713334 ("the trooper observed the defendant cross over the fog line briefly on one occasion. * * * Although we may concur the traffic [violation was] minimal, [it was] nonetheless [a violation] of the traffic code, R.C. 4511.33 * * *."); State v. Eastep (Mar. 22, 2000), 9th Dist. No. 19703 ("For no apparent reason, Defendant's vehicle swerved off to the right side of the road by at least one foot. Trooper Dearmitt observed Defendant drive over the white line for approximately forty feet. He did not see any defects or hazardous conditions in the roadway to warrant such driving behavior. * * * Based on Trooper Dearmitt's observation of Defendant traveling over the white line, he had both a reasonable suspicion of criminal activity and probable cause to stop Defendant's vehicle."); and, State v. Williams (June 18, 2001), 12th Dist. No. CA2000-11-029 ("Trooper Slusher observed appellant's vehicle travel over the right edge line when it approached a semi truck, travel over the left edge line while passing the semi, and cross the right edge line again after it re-entered the right lane completing the pass. Appellant committed three marked lane violations in all. See R.C.4511.33. Since Trooper Slusher observed these three marked lane violations, he had probable cause to stop appellant.").
[22] We note that our decision today might not conflict with these cases, because a proper inquiry for constitutional stops requires a two-step approach. First, the trier of fact must determine whether the officer had probable cause to stop the vehicle, under the aforementioned test, and if the trier of fact determines that the officer had probable cause to commence a traffic stop, then the inquiry ends. However, if the officer did not have probable cause to stop the vehicle, then the trier of fact must determine whether the officer had a reasonable articulable suspicion that a traffic violation had occurred or was occurring. Accordingly, it is important that courts distinguish between each approach and apply each in order. See Goodwin, 2006-Ohio-3563, at ¶¶11-13.
[23] Md. Code Ann., Trans., § 21-309 provides, in pertinent part:
 (a) On any roadway that is divided into two or more clearly marked lanes for vehicular traffic, the following rules, in addition to any others consistent with them, apply.
 (b) A vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so.
[24] We note also that R.C. 4511.33(A) would be totally inapplicable on rural roadways which are not marked with a centerline, but which are marked with right white edge lines.
[25] We note that our interpretation does not require us to consider, at this time, the requisite degree of culpability required for a driver to violate R.C. 4511.33(A).
[26] In addition to the testimony discussed, there was also no testimony as to Phillips' speed or any other evidence which would have indicated a violation of law.
 Judgment Affirmed.